## UNION R. CO. v. TATE.

(Circuit Court of Appeals, Third Circuit. February 12, 1907.)

### No. 52.

RAILROADS—INJURY TO PERSON IN SWITCHYARDS—NEGLIGENT OPERATION OF TRAINS.

Evidence *held* to sustain the verdict of a jury awarding damages against a railroad company for the death of a brakeman employed by another company, resulting from a collision in switching yards between the train on which the deceased was working and a long train of defendant company which was backed into the yards, on the ground that such evidence warranted a finding that the defendant company was negligent in failing to prescribe proper rules and regulations for the movement of its trains, and in permitting a train of such length to be backed into the yards around a curve which obstructed the view of the engineer without sufficient brakemen thereon to pass a signal to him when there was danger of a collision.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

George E. Show, for plaintiff in error.
Louis K. Porter, for defendant in error.

Before GRAY and BUFFINGTON, Circuit Judges, and LANNING, District Judge.

GRAY, Circuit Judge. The suit in the court below was brought by the defendant in error against the plaintiff in error and the Pittsburgh & Lake Erie Railroad Company, upon an alleged joint tort, to wit, that the death of the plaintiff's husband, David Tate, was directly and approximately caused by the gross negligence and carelessness of the defendant companies acting together. After a motion for a compulsory nonsuit, the plaintiff was permitted to amend her statement of

claim, by striking out all reference to the Pittsburgh & Lake Erie Railroad Company, taking a voluntary nonsuit as to that company, and by alleging negligence of the Union Railroad Company alone.

The facts which seem to be admitted on both sides, are that the death of the decedent occurred at the Port Perry yard of the Pittsburgh & Lake Erie Railroad Company. This yard is used jointly by the Pittsburgh & Lake Erie Railroad Company and the Union Railroad Company, the plaintiff in error. It lies to the east of the north-bound track of the Pittsburgh & Lake Erie Railroad Company. The yard contains five separate tracks and a spur track, parallel to the main tracks of the latter railroad company, and all of the yard tracks are connected at either end by a lead switch with the north-bound track of the same railroad. These tracks are known as No. 1, No. 2, No. 3, etc.

The Union Railroad's main track runs from the Steel Works at Bessemer, and connects with the north-bound track of the Pittsburgh & Lake Erie Railroad, about 1,000 feet north of the switch leading into the lower end of the Port Perry yard, so that, in order that a train on the Union Railroad may reach the Port Perry yard, it is necessary for it to run south on the north-bound track of the Pittsburgh & Lake Erie Railroad, a distance of about 1,000 feet. This access to the Port Perry yards by the Union Railroad trains is governed by a contractual arrangement between the two railroad companies and joint rules prescribed therefor.

The decedent was in the employ of the Pittsburgh & Lake Erie Railroad Company, as a rear brakeman on a freight train. The crew to which he belonged had brought a train, consisting of 22 cars and a caboose, on the south-bound track of said company, from Rankin, and, for the purpose of picking up 19 cars that were lying on No. 3 track of the Port Perry yard, they stopped at a point opposite that yard, detached the caboose, which was lying on the south-bound main track, and the remainder of the train was switched over to the north-bound track and backed into the yard at its upper end on No. 3 track, upon which the cars to be moved were lying. Some minutes before this, a Union Railroad train applied for admission to the yard, to reach which, as before stated, it had to run south on the north-bound track about 1,000 feet, and enter the yard at the lower end, the end opposite to that from which the Pittsburgh & Lake Erie train entered. The rules governing the use of the yard by the Union Railroad trains require the conductor of the crew to obtain permission to enter the same from a telegraph operator stationed at a tower house at the junction of the Union Railroad with the Pittsburgh & Lake Erie Railroad. Before the operator could give permission, he was required to notify, by telegraph, another operator at a tower near the switch leading from the north-bound main track into the lower end of the yard. This was done, and the latter operator put up the usual signal, indicating that the track was closed to all north-bound traffic. He also opened the switch into the yard, as was his duty, and the switch from the lead into the No. 2 track. He then telegraphed the junction operator that the track was clear, and the latter told the conductor of the Union Railroad to proceed. It seems to be in dispute how long an

interval elapsed, after this permission to proceed was given to the Union Railroad train, before the conductor of that train caused it to be backed in on the Pittsburgh & Lake Erie north-bound track, but there is evidence tending to show that it was five or more minutes after the Pittsburgh & Lake Erie train came into the yard, before the Union Railroad train was backed in from the north-bound track onto track No. 2

The Union Railroad train consisted of 76 empty cars, in front of the locomotive pushing the same. The train was pushed at a speed of 2½ or 3 miles an hour. A brakeman, who was acting as conductor of the train, was riding on the front car (that is, the one farthest from the engine), and three brakemen were stationed at intervals between him and the locomotive. The train was backed down, around the sharp curve of the Union Railroad, onto the north-bound track of the Pittsburgh & Lake Erie Railroad. Some five minutes or more before the Union Railroad train commenced to move, the Pittsburgh & Lake Erie train had come into the yard from the upper end, on No 3 track, and was backed down this track against the 19 cars that were lying there. Two attempts were made to effect a coupling, the result of which was to push the last car of the 19 so far out on the lead track, as to obstruct the entrance of the Union Railroad train on No. 2 track.

When the Union Railroad train was within 8 or 10 car lengths of No. 2 track, the conductor of the Union Railroad train first noticed the obstructing Pittsburgh & Lake Erie cars He testifies that he then signaled the brakeman back of him, who in turn signaled the next brakeman, but the engineer testifies that he got no signal to stop, and that the sharp curve and an embankment on the inside of the curve prevented his seeing the far end of the train. The towerman, who had signaled the conductor to stop, realizing that the Union Railroad train, in running onto track No. 2, would "side-swipe" the Pittsburgh & Lake Erie car that had been pushed out on the lead, ran over to the switch on No. 2 track, about 100 feet distant, and turned the switch, so that the cars would strike square and do less damage. The cars did strike, and the decedent was found lying on No. 3 track under the third car from the engine, a point 38 or 39 car lengths from the point of collision. The collision was not violent, according to the Union Railroad engineer, who testified that, when he felt the train stop, he supposed it was due to the ordinary contact when a coupling is made. The collision, however, according to the testimony of the engineer of the Pittsburgh & Lake Erie train, was of sufficient force to move his train a distance of 2 or 2½ car lengths, a distance of about 75 feet.

The trial resulted in a verdict and judgment in favor of the plaintiff. A writ of error sued out by the defendant company brings before us but two specifications of error, which in effect raise but one question, viz., whether there was any evidence by which the verdict for the complainant could be sustained. In the submission of the case to the jury, that question was reserved, and upon a rule for judgment non obstante veredicto, the court discharged the rule and entered judgment on the verdict. This has imposed upon the court

the duty of carefully examining the testimony, the whole of which has been sent up in the record. As we have often had occasion to say, the question in such cases is, not what our opinion would have been if we had been jurors, but whether the plaintiff has given sufficient evidence to support or justify a verdict in his favor; "not whether, on all the evidence, the preponderating weight is in his favor, —that is the business of the jury—but, conceding to all the evidence offered the greatest probative force which, according to the law of evidence, it is entitled to, is it sufficient to justify a verdict?"

The amended statement of claim charges that decedent's death was directly and approximately caused by the gross negligence of the defendant company, in that the conductor and engineer of the Union Railroad train failed to give any notice, by signal or otherwise, of the approach of the said Union train, and also that the conductor and engineer and employés of the defendant were guilty of like negligence, in operating a train of such great length, in backward motion, without having sufficient trainmen to keep the said train under complete regulation and control. It is the contention of the plaintiff in error, that there was no sufficient evidence of negligence on the part of the conductor and other trainmen in charge of the Union Railroad train, but that, if there were, under the Pennsylvania act of 1868, the negligence of those trainmen was, as to the decedent, the negligence of fellow servants. We do not propose to discuss the evidence at length, or at all, as it is sufficient to say that a careful examination of the testimony disclosed in the record convinces us that the evidence in this respect was sufficient to go to the jury, if not made unavailable by the act of 1868, above referred to.

But whether this act is so applicable, as, in effect, to make these Union Railroad trainmen fellow servants with the decedent, it is not necessary for us to determine. The amended statement of claim not only charges the negligence of the employés, but also that the defendant company itself was guilty of gross negligence, in not prescribing proper rules and regulations for the movement of trains on said railroads, and in permitting its train to enter the Port Perry yard in the manner and under the circumstances stated, to wit, running backward uncontrolled, or not under such proper control as to prevent a collision. It is shown by the testimony that this train of 76 cars was nearly half a mile in length; that it was being backed onto the tracks of the Pittsburgh & Lake Erie, around a sharp curve; and the testimony of the conductor, brakeman and engineer tended to show that, under the circumstances, it was not possible to promptly and efficiently signal the engineer from the foremost car, so as to keep the movement of the train under proper control. There was also testimony tending to show that such a backing of long trains was habitual in the operation of the defendant road. Such being the case, we cannot see that it was an unjust or improper inference that the train in question, and others of like length, were so moved pursuant to the permission and requirement of the defendant company itself. If such were the case, and it were shown that such movement of the trains violated a duty owed by the company (in this case the master) to those who came within their danger, it was a negligence to be im-

puted to the master, and not to the servants. It follows, therefore, that, even if under the Pennsylvania statute, the decedent's right of action is only such as would exist if he were an employé of the defendant road, he would still be entitled to recover for the negligence charged against the defendant company itself; for it is well settled that, though one accepting employment assumes the risk of the negligence of a fellow servant, there is never an assumption of risk arising from the personal negligence of the master.

Careful consideration of the record in this case does not permit us to say that there is no evidence sufficient to warrant a jury in finding the existence of such master's negligence on the part of the defendant company, and so finding in favor of the plaintiff. Though assignments of error which raise the question, whether, upon all the evidence, the jury should not have been charged to find a verdict for the defendant, or whether a judgment non obstante veredicto should not have been entered in its favor, challenge the closest scrutiny by the reviewing court of all the evidence sent up in the record, no good end is to be accomplished by the court's analyzing and rehearsing the testimony upon which its conclusion is founded. It suffices in this case to say that, in our opinion, the court below was right in refusing the judgment non obstante veredicto, and the action of the court in so doing is hereby affirmed.